## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RHONDA BAILEY,                    )
                                  )
        Plaintiff,                )
                                  )
        v.                        )          Civil Action No. 06-18 Erie
                                  )
JO ANNE B. BARNHART,              )
Commissioner of Social Security,  )
                                  )
        Defendant.                )

## <u>MEMORANDUM OPINION</u>

McLAUGHLIN, SEAN J., J.

        Plaintiff, Rhonda Bailey, commenced the instant action pursuant to 42 U.S.C. §§ 405(g)

and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social

Security denying her claims for disability insurance benefits ("DIB") and supplemental security

income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq,* and §

1381 *et seq.* Bailey filed applications for DIB and SSI on January 27, 2002, alleging disability

since May 21, 2002 due fibromyalgia, osteoarthritis, moderate scoliosis and cervical stenosis

(Administrative Record, hereinafter "AR", 59-61; 74; 196-198). Her applications were denied,

and she requested a hearing before an administrative law judge ("ALJ") (AR 44-48; 200-203). A

hearing was held before an administrative law judge ("ALJ") on December 9, 2003 (AR 307-

327). Following this hearing, the ALJ found that she was not entitled to a period of disability,

DIB or SSI under the Act (AR 207-213). The Appeals Council granted Bailey's request for

review and remanded the case to the ALJ for further administrative proceedings (AR 216-218).

        The ALJ conducted a subsequent hearing on May 3, 2005 (AR 328-350). On August 19,

2005, the ALJ again found that Bailey was not entitled to a period of disability, DIB or SSI under

the Act (AR 19-29). Her request for review by the Appeals Council was denied (AR 11-14),

rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action

challenges the ALJ's decision. Presently pending before the Court are cross-motions for

summary judgment. For the reasons set forth below, we will deny both motions.

## I. BACKGROUND

Bailey was born on December 7, 1962, and was forty-three years old on the date of the ALJ's decision (AR 59).  She has an eleventh grade education and completed her GED in June 1981.  Her past work experience was as a machine operator in a factory (AR 75; 80).

Bailey was treated by Lynn Cornell, M.D. in the Spring of 2002 for back, shoulder and trapezius pain (AR 155).  On May 7, 2002, Bailey was seen by a physician's assistant at Dr. Cornell's office and complained of back pain and left-sided shoulder pain radiating down the back of her left arm (AR 157).  On physical examination, spasms of the left-sided thoracic paravertebrals and mild spasm in the cervical spine were noted (AR 157).  Her upper extremity reflexes were intact and strength testing was 5/5 (AR 157).  Diagnostic studies were ordered and Naprosyn and Flexeril were prescribed (AR 157).

Bailey returned to Dr. Cornell's office on May 15, 2002 complaining of constant, sometimes sharp pain, but denied numbness or tingling (AR 156).  She claimed the Naprosyn and Flexeril had not helped with her pain (AR 156).  A physician's assistant reported positive tenderness to palpation of the left shoulder and left trapezius muscle, with increased pain noted with her arms placed above her head and behind her back (AR 156).  Decreased grip strength was noted of the left arm, and she had decreased neck range of motion secondary to pain (AR 156). She was assessed with left shoulder strain/left trapezius muscle strain, and referred to physical therapy (AR 156).

Bailey underwent physical therapy from May 22, 2002 through July 5, 2002 (AR 120-127).  During the initial evaluation, Bailey reported constant pain, on a scale of 8 to 10 (AR 126). She claimed that any activity increased her pain, but lying down decreased the pain (AR 126). Phyllis Mitchell, LPT, found tenderness and tightness over the left trapezius and middle deltoid musculature (AR 126). Ms. Mitchell formed an impression of evident postural changes, increased muscle tightness and spasm along the left trapezius scapular area with increased pain complaints, and mild cervical mobility deficits with some left shoulder and scapular strength deficits (AR 127).  Bailey reported a decrease in muscle tightness following therapy (AR 127). In May 2002, she was able to perform all activities in therapy with no increase in discomfort (AR 125).

2

Bailey returned to Dr. Cornell's office on May 23, 2002 and complained of persistent left shoulder, back and hip pain (AR 156). Physical examination revealed positive tenderness to palpation of the left shoulder, left trapezius muscle, paraspinal muscles of the lumbosacral spine and hips bilaterally (AR 156). She was assessed with arthralgias, myalgias, left shoulder strain and left trapezius muscle strain (AR 156). Bailey was instructed to continue with physical therapy and was prescribed Elavil (AR 156).

On May 30, 2002, Bailey reported back, shoulder and trapezius pain (AR 155). She claimed she had difficulty with activities of daily living, her day-to-day routine and at work (AR 155). She reported she was unable to stay in a car very long and had difficulty getting out of a car (AR 156). Dr. Cornell rendered a tentative diagnosis of fibromyalgia, recommended she continue physical therapy, and referred her to a rheumatologist for further evaluation (AR 155).

At physical therapy on June 3, 2002, Bailey reported extreme pain over her spine, pain radiating down into her shoulders, headaches and lightheadedness (AR 124). She continued to exhibit some weakness (AR 124). On June 10, 2002, Bailey reported spine tenderness and radiating pain into her right scapular area and down her left arm (AR 124). She was able to perform all therapy activities with no significant increase in discomfort noted (AR 124). On June 13, 2002, Bailey reported that she continued to experience tightness on the right hand side (AR 123). She tolerated therapy well with mild tenderness noted afterwards (AR 123).

Upon referral by Dr. Cornell, Bailey was seen by Kathe Bryson, M.D., a rheumatologist on June 14, 2002 for evaluation of possible fibromyalgia (AR 118). Dr. Bryson reviewed Bailey's diagnostic studies, which revealed minimal degenerative disc space narrowing at C5-C6, and thoracic studies showing moderate rightward mid-thoracic scoliosis, associated with narrowing of the intervertebral disc space (AR 118). On physical examination, Bailey exhibited good joint motion throughout the peripheral joints, with no evidence of warmth, erythema, effusion, tenderness or synovitis (AR 117). Her reflexes were intact, as was her strength in the upper and lower extremities (AR 117). Dr. Bryson found she had marked tenderness to palpation of the spinous processes, trapezius muscles, supraspinatus and the SI joints, and had reduction in lateral rotation, flexion and extension of the cervical spine (AR 117). She was diagnosed fibromyalgia, more specifically myofascial pain syndrome, given the limited nature of her pain,

3

and Dr. Bryson was of the opinion that symptoms of arthritis contributed to her pain as a result of the scoliosis (AR 117). Dr. Bryson agreed with Bailey's physical therapy regime, and recommended that MRI's of the cervical and thoracic spine be obtained (AR 117). She further recommended the addition of Flexeril and Ultram to her medication regime (AR 117).

Physical therapy notes dated June 18, 2002 reflect that Bailey reported she had seen a specialist, who informed her that the osteoarthritis in her back was causing increased pain and discomfort (AR 123). Bailey claimed she no longer had difficulty with her shoulder, but continued to experience increased discomfort over her spine area (AR 123). She tolerated therapy well and performed all activities with no increase in pain or discomfort (AR 123). The therapist noted that Bailey was "not having difficulties performing any daily activities" (AR 123).

On June 20, 2002, Bailey reported to Dr. Cornell that physical therapy helped with the tightness in her shoulders and upper back area, but she still complained of lower back pain (AR 154). She claimed she had difficulty completing minor household chores due to fatigue and had difficulty getting out of bed (AR 154). She reported she was able to sit for about 30 minutes but then needed to move around since she became quite stiff, and she could stand for about 30 to 45 minutes (AR 154). She was able to walk about a half a block down a hill to visit her mother but returning home was difficult (AR 154). On physical examination, Dr. Cornell noted paraspinal spasm in the right mid-spine, flexion and extension of her head and side-to-side movement of her head was quite slow, and she had pain with knee extension (AR 154). Dr. Cornell continued her medication regime (AR 154).

When discharged from therapy on July 5, 2002, Bailey reported she felt better overall but still had achiness along the spine, neck and low back (AR 120). She reported that her shoulders and upper trapezius area were "much better" (AR 120). She rated her back pain as a 1.6 out of 10 in the morning, but claimed after increased activity it rose to 9.2 out of 10 (AR 120). Physical examination revealed a more upright posture with equal shoulder heights, cervical range of motion within normal limits and improved upper extremity strength (AR 120). Ms. Mitchell noted that Bailey had returned to most activity including work on a more steady basis with some pain complaints (AR 120). Ms. Mitchell opined that Bailey had demonstrated definite improvement in cervical mobility, posture and strength (AR 120). She noted that Bailey still

4

complained of increased pain after a long work day, but considered this normal given the arthritic changes in her spine (AR 120). Bailey was discharged from formalized physical therapy since she was independent with the home exercise program and had reached goals (AR 120).

Bailey reported to Dr. Cornell on July 11, 2002 that her upper back and shoulders felt significantly better and she had an increased range of motion following the completion of physical therapy (AR 152). She still claimed to have low back pain with an aching sensation that kept her up at night and limited her ability to sit or stand for any length of time (AR 152). Dr. Cornell noted she had tenderness mostly in the low back area on physical examination (AR 152). Dr. Cornell increased her dosage of Elavil, and discussed with Bailey the possibility of seeing a pain management specialist for her low back pain (AR 152). Dr. Cornell noted that she was unable to perform her job since it required a lot of bending, lifting, pushing and pulling which Bailey was unable to do (AR 152). She referred her back to Dr. Bryson for further evaluation (AR 152).

Bailey returned to Dr. Bryson on July 30, 2002, who noted that x-rays of her lumbosacral spine showed no significant osteoarthritis (AR 117). Bailey reported that she had finished physical therapy and noted improvement in her shoulder area (AR 117). Dr. Bryson reported that she had sensitivity to touch in her paraspinal muscles and spinous processes, but no tender points elsewhere (AR 117). She had no synovitis, her straight leg raising test was negative bilaterally, and her reflexes and strength were symmetric (AR 117). Dr. Bryson discontinued the amitriptyline and placed her on Flexeril at night (AR 116).

Bailey reported chronic pain in different areas of her back when seen by Dr. Cornell on August 8, 2002 (AR 151). She reported she was able to sit less than one hour and experienced pain in her hip area upon standing (AR 151). She claimed she needed to lie down one or two hours during the day in order to alleviate her back pain (AR 151). Dr. Cornell reported that she was tender in the mid-thoracic area, forward flexion caused some pain, and range of motion of the neck was normal (AR 151). She continued Bailey's medication while awaiting the MRI results (AR 151).

When seen by Dr. Bryson on August 27, 2002, Bailey reported that she had more bad days than good, and her sleep was not as good with the Flexeril (AR 116). On physical

examination, Dr. Bryson found good joint motion with no evidence of warmth, erythema, effusion, tenderness or synovitis (AR 116).  She discontinued the Flexeril and Naproxyn, and placed her back on the amitriptyline and added Bextra to her medication regime (AR 116).

On September 19, 2002, Bailey reported to Dr. Cornell that she had significant pain on a regular basis, especially in her lower back and hip areas (AR 150).  She was able to sit 20 to 25 minutes and stand 10 to 15 minutes before she experienced lower back and groin pain (AR 150).  Bailey claimed that she had recently experienced several "bad days" which were quite uncomfortable (AR 150).  On physical examination, Dr. Cornell found she had tenderness in the right lumbosacral area, with forward flexion to 80 degrees and backward extension to 15 degrees (AR 150).  She was assessed with chronic back pain, possible fibromyalgia, and was continued off work (AR 150).

Bailey returned to Dr. Bryson on November 19, 2002 and reported increased pain in her low back and right hip area (AR 115).  She claimed the pain was exacerbated with the slightest motion such as bending, stooping or reaching (AR 115).  She reported that the amitriptyline and Bextra, while initially helpful, were not as effective (AR 115).  On physical examination, Dr. Bryson found multiple tender points over the trapezius muscles, as well as the SI joints (AR 115).  No active synovitis was revealed in examination of her shoulders, elbows, wrists, hands, hips, knees, ankles or feet (AR 115).  Dr. Bryson informed Bailey that it could take some time to adjust to the medication before optimal symptom relief was obtained (AR 115).  Dr. Bryson increased her amitriptyline dosage, discontinued the Bextra, and started her on Ultram (AR 115).

On January 3, 2003, Dr. Bryson completed an Employability Assessment Form and opined that Bailey was permanently disabled due to fibromyalgia and cervical stenosis, based upon physical examination, a review of medical records, her clinical history, and appropriate tests and diagnostic procedures (AR 114).

Bailey returned to Dr. Cornell on February 4, 2003 and reported pain and difficulty with activities of daily living (AR 147).  She claimed she had difficulty getting out of bed in the morning, had difficulty with stairs, problems doing the dishes and cleaning up around the house (AR 147).  She reportedly tried walking, but was unable to walk up to two blocks (AR 147).

On February 10, 2003, Bailey complained of increased pain since the weather had cooled

with more bad days than good, but the amitriptyline had helped with her sleep (AR 112).  On physical examination, Dr. Bryson noted tender points on Bailey's anterior chest wall, trapezius muscle, and sacroiliac joint (AR 112).  No active synovitis was noted in examination of the shoulders, elbows, wrists, hands, hips, knees, ankles and feet (AR 112).  Dr. Bryson observed that her medications were being used at low doses, and increased her Darvocet dosage and added Flexeril (AR 112).

Bailey returned to Dr. Bryson on March 18, 2003 and reported that while her pain had not gone away, it was more manageable due to higher doses of medication (AR 187).  She claimed it was hard to arise from a squatting position unless she held on to something (AR 187).  Physical examination revealed significant tenderness with palpation of the trapezius muscles, anterior chest wall, sacroiliac joints and supraspinatus muscles (AR 187).  Dr. Bryson indicated that Bailey should have shown improvement in her symptoms (AR 187).

Bailey underwent a consultative evaluation on April 16, 2003 performed by John M. Ferretti, D.O., an internal medicine specialist (AR 167-169).  Bailey reported a history of fibromyalgia, spinal cord stenosis and scoliosis (AR 167).  On physical examination, Dr. Ferretti reported that Bailey's motor strength was 5/5 bilaterally, grip strength was 100 percent bilaterally, she was able to heel/toe walk for ten feet without difficulty or assistance, rise from a squatting position with the assistance of a chair for stabilization, and was able to do straight leg lifts without difficulty or pain (AR 168).  Dr. Ferretti formed an impression of fibromyalgia, mild cervical spine stenosis without radicular component, and mild to moderate cervical and thoracic scoliosis (AR 169).  Dr. Ferretti opined that Bailey could only occasionally crouch and climb, needed assistance to rise from a squatting position and was restricted around heights, but otherwise had no limitations (AR 170-171).

On May 1, 2003, a state agency adjudicator opined that Bailey could perform sedentary work that did not involve more than occasional climbing, balancing, stooping, kneeling, crouching or crawling (AR 175-176).

Bailey returned to Dr. Bryson on May 20, 2003 for follow up for her fibromyalgia (AR 184).  Her medication regime consisted of Elavil, Flexeril and Darvocet (AR 184).  She reported neck spasms but felt her medication was helpful (AR 184).  On physical examination, Dr. Bryson

7

reported Bailey had good joint motion throughout with no synovitis, good reflexes and intact muscle strength (AR 184).  Dr. Bryson found tenderness to palpation of the trapezius muscles and supraspinatus muscles (AR 184).  Dr. Bryson noted that Bailey's fibromyalgia was stable, but she was "having a little bit more symptoms now" (AR 184).  She increased her Elavil dosage (AR 184).

On July 22, 2003, Bailey reported palpitations from the amitriptyline (AR 190).  Dr. Cornell decreased the dosage and advised her to avoid caffeine (AR 190).

Bailey returned to Dr. Bryson for follow up on August 22, 2003 and reported an increase in her pain (AR 184).  She claimed she was doing less, was very fatigued, and had trouble sleeping (AR 184).  She reported that she noticed an increase in her weight after her Elavil dosage was increased (AR 184).  Physical examination revealed good joint motion throughout with no evidence of synovitis (AR 183).  Dr. Bryson opined that Bailey's weight gain due to the side effects of the Elavil could cause her to spiral downward with her symptoms (AR 183).  She weaned her off the Elavil and added Effexor to her medication regime (AR 183).

On October 24, 2003, Bailey reported that her fibromyalgia symptoms were worse due to a recent fall and the weather, although the Effexor had helped with the pain (AR 183).  She claimed to still suffer from sleep disturbances (AR 183).  Dr. Bryson added Sonata to her medication regime (AR 183).

Bailey returned to Dr. Bryson on February 5, 2004 for follow up and complained of pain in her thoracic area (AR 265).  Dr. Bryson reviewed her August 2002 MRI's which showed an anulus bulge at T7-T8 and multi-level disc bulging in the cervical spine (AR 265).  Physical examination revealed good joint motion with no active synovitis and tenderness to palpation of the paraspinal muscles around her entire spine (AR 265).  Dr. Bryson assessed her with a fibromyalgia flare, but ordered repeat MRI's to rule out the possibility of herniated discs (AR 265).

An MRI of the cervical spine conducted on February 15, 2004 showed bulges at the C5-6 and C6-7 areas with mild herniation suspected at the C5-6 area, mild to moderate foraminal narrowing at C5-6 and mild foraminal narrowing at C6-7, mild bulging annuli from C3 through C5 with small central disc protrusion at C4-5 and reversal of the normal cervical lordosis

consistent with muscle spasm (AR 266).  An MRI of the thoracic spine revealed a mild right-sided herniation at T7-8 causing mild impress on the spinal cord and a small central protrusion at T8-9 (AR 267).

Bailey was seen by Dr. Cornell on March 3, 2004 with a chief complaint of a left knee injury (AR 273).  Dr. Cornell observed swelling and bruising, and assessed her with left knee strain (AR 273).  Dr. Cornell referred her to an orthopedist for evaluation (AR 273).

Bailey was evaluated by George Hochreiter, D.O., for evaluation of left knee pain on April, 5, 2004 (AR 268-269).  She relayed a history of chronic back pain and was on Flexeril, Effexor, Darvocet and Sonata (AR 268).  Bailey reported that in March 2004 she tripped, fell and twisted her left knee, which resulted in pain and swelling (AR 268).  X-rays of the left knee conducted March 5, 2004 were normal (AR 269; 277).  Dr. Hochreiter assessed her with left knee sprain, rule out meniscal tear, and recommended continuation of symptomatic treatment (AR 269).

On April 21, 2004, Bailey returned to Dr. Cornell for a routine physical, who noted her past medical history was significant for fibromyalgia for which she was being treated by Dr. Bryson (AR 270).  She was on Flexeril, Effexor, Darvocet and Sonata (AR 270).  Dr. Cornell noted that Bailey was "quite limited" in her physical activities and was seeking disability (AR 270).

On May 19, 2004, Nancy Carpenter, M.D., a state agency reviewing physician, opined that Bailey could perform light work but only occasionally climb, balance, stoop, kneel, crouch and crawl (AR 280-281).  In support of her assessment, Dr. Carpenter listed a "PCP" treatment note dated March 3, 2003, Dr. Bryson's treatment note dated February 5, 2004 and Bailey's February 2004 diagnostic studies (AR 280).

Dr. Bryson reported on June 25, 2004 that Bailey's recent MRI's were not significantly different from her 2002 MRI (AR 300).  Bailey reported she experienced headaches and needed to lie down at least three to fours hours during the day (AR 300).  On physical examination, Dr. Bryson found adequate joint motion with no obvious synovitis, nodules or deformities noted (AR 300).  Dr. Bryson recommended that Bailey reconsider pain management since her medications had not been as effective as she had hoped (AR 300).

9

On October 22, 2004, Bailey reported to Dr. Bryson that she had to cancel a scheduled pain management appointment for epidural injections due to transportation issues (AR 299).  She reportedly continued to have a lot of pain in the neck and shoulder area, and claimed that at times she was in so much pain she felt as though she could not walk straight (AR 299).  Dr. Bryson found good joint motion on physical examination with no active synovitis, but she had painful range of motion of most joints (AR 299).  Dr. Bryson informed Bailey that she was as stable as she was going to be with her medication regime, and unfortunately, she had only a limited response to them (AR 299).

On January 28, 2005, Bailey complained of severe pain along her spine spreading to her back (AR 299).  Dr. Bryson prescribed a Medrol Dosepak (AR 299).  On February 3, 2005, Dr. Bryson prescribed Tylenol 3 with codeine (AR 299).

Bailey returned to Dr. Bryson on March 1, 2005 who reported that Bailey's symptoms remained the same, except that Bailey was reportedly very fatigued and needed to lie down a lot (AR 298).  Her medications consisted of Tylenol with codeine, Flexeril, Effexor and Sonata (AR 298).  A Medrol Dosepak given to Bailey in January had not provided any relief (AR 298).  On physical examination, Dr. Bryson found Bailey had good joint motion with no active synovitis, but had painful range of motion of the joints throughout (AR 298).  Dr. Bryson found Bailey had obtained some relief with the Tylenol and increased the dosage (AR 298).

Bailey underwent a consultative evaluation on March 2, 2005 performed by Silvia Ferretti, D.O. (AR 288-290).  Bailey presented with a chief complaint of neck, thoracic and lumbar back pain, and relayed a history of fibromyalgia, osteoarthritis, scoliosis, cervical stenosis and bursitis of her hips (AR 288-289).  She reportedly stopped working in May 2002 due to pain (AR 288).  She claimed she could sit for 15 to 20 minutes and stand and walk for just a few steps (AR 288).  Bailey reported  she was able to dress, feed herself and drive (AR 288).  On physical examination, Dr. Ferretti reported normal cervical range of motion, strength was 5/5 bilaterally, sensory was intact, and hip, knee, and ankle range of motion was intact (AR 289).  Bailey was able to take short steps on her heels and in toe walking, her straight leg raising testing was negative in the sitting and standing position, and she did all transfers independently (AR 289).  Dr. Ferretti found Bailey had trigger points around the scapular area, supraspinatus, infraspinatus

and rhomboids areas, and there was some pain at the trochanteric area of her hips and at the epicondyles of her elbows (AR 289).

Dr. Ferretti formed an impression of probable fibromyalgia, osteoarthritis, mild stenosis of the neck, herniated disc in the thoracic area by MRI (AR 289). Dr. Ferretti's evaluation reflects that she reviewed multiple notes from Dr. Cornell, x-rays, MRI reports, Dr. Hochreiter's report, Dr. John Ferretti's report, and Dr. Bryson's note that Bailey was adjusting to her medication (AR 290). Dr. Ferretti opined that Bailey could occasionally lift 15 pounds, frequently lift 10 pounds, stand/walk eight hours in an eight-hour workday and sit eight hours in an eight-hour workday (AR 291-292). Dr. Ferretti further opined that she needed to sit/stand/walk as needed, and could stand/walk for no more than 20 minutes without interruption, and could sit for no more than 30 minutes without interruption (AR 292). Dr. Ferretti concluded that Bailey could never climb, stoop, kneel, balance, crouch and crawl (AR 292).

Finally, on May 13, 2005, Dr. Bryson prepared a narrative report stating that Bailey suffered from fibromyalgia, a chronic noncurable disease, and described the characteristics of the disease in patients generally (AR 303). Dr. Bryson indicated that patients with fibromyalgia had widespread pain in the muscles and joints which waxed and waned and was easily exacerbated (AR 303). She explained that patients also characteristically had labile bowel symptoms, very poor sleep patterns, nonrestorative sleep, mitral valve prolapse and other symptoms such as generalized paresthesias (AR 303). Patients experienced overwhelming fatigue, had widespread areas of tenderness involving most joint and muscle groups and had painful range of motion of joints (AR 303). Dr. Bryson stated that adequate periods of rest were extremely important for patients with fibromyalgia since they had very poor sleep patterns (AR 303).

Regarding Bailey specifically, Dr. Bryson stated that she had been on a number of listed medications with very limited response (AR 303). She opined that "[a]t this point in time, I do not see how Rhonda could remain gainfully employed. She is so fatigued that she would need to lie down several times throughout the day and has so much pain with motion of her joints that this makes gainful employment impossible" (AR 303).

Bailey testified at both hearings held by the ALJ on December 9, 2003 and May 3, 2005 (AR 307-350). At the first hearing, Bailey testified she resigned from her job because she could

11

not "handle the pain" and was "shaking all the time" (AR 314).  She testified that she suffered from pain in her back, arms and legs, and also had daily headaches (AR 314-315).  She claimed that activities aggravated her pain, but medication was somewhat effective in alleviating her discomfort (AR 315).  She testified that she was only able to stand for 10 minutes, sit for 15 to 20 minutes, lift 2 to 3 pounds and walk half a block (AR 315).  She further testified that she was able to bath and dress herself, but needed help preparing meals and shopping for groceries (AR 318; 320).  She was able to begin performing household chores but could not complete them due to pain (AR 319).  Bailey testified that she would lie down to alleviate her pain (AR 318).  She suffered from "bad days" approximately 50 percent of the time and would lay down for 3 or more hours (AR 321).  She spent her days lying down or doing a "little bit" of needlepoint (AR 320).  She claimed physical therapy aggravated her symptoms (AR 318).  Baily also testified that she suffered from sleep disturbances (AR 322).

At the second hearing, Bailey testified that the severity of her symptoms had remained the same, but she suffered from pain for longer periods of time (AR 337).  She testified that the Tylenol 3 had helped alleviate the pain, but she had to lay down for 4 to 5 hours per day due to pain and fatigue (AR 338; 343).  She claimed she could only stand for 5 minutes, sit for 10 minutes, lift about 5 pounds and avoid bending (AR 339).  She testified that she did not engage in needlepoint as much since the last hearing (AR 341).

The vocational expert was asked to consider an individual of Bailey's age, education, and vocational background, who was limited to sedentary work with a sit/stand option, and who would not be able to engage in climbing, crawling, kneeling, repeated bending at the waist to 90 degrees, or engage in constant manipulation with her hands (AR 344).  The expert testified that such an individual could work as a surveillance system monitor, toll taker, credentials checker, inspector and general clerk (AR 345).  The expert further testified that such an individual would be unable to perform any of the cited jobs if she were off task 10 to 15 percent of the workday, excluding scheduled breaks and lunch period, or had to lie down for 2 hours in an eight-hour workday (AR 346-347).

The ALJ subsequently issued a written decision which found that Bailey was not entitled to a period of disability, DIB or SSI within the meaning of the Social Security Act (AR 19-29).

Her request for an appeal with the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner (AR 11-14). She subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that Bailey met the disability insured status requirements of the Act (AR 20). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).  If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen,* 482 U.S. at 141.  If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.*  If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117.

The ALJ resolved Bailey's case at the fifth step.  At step two, the ALJ determined that her degenerative disc disease of the cervical spine and fibromyalgia were severe impairments, but determined at step three that she did not meet a listing (AR 21; 25).  At step four, the ALJ determined that she could not return to her past work, but retained the residual functional capacity to perform work at the sedentary level with a sit/stand option, and could perform no climbing, crawling, kneeling, repeated bending to 90 degrees and constant manipulation with her hands (AR 25).  At the final step, the ALJ determined that Bailey could perform the jobs cited by the vocational expert at the administrative hearing (AR 27-28).  The ALJ additionally determined that her statements concerning the intensity, duration and limiting effects of her symptoms were only partially credible (AR 26).  Again, we must affirm this determination unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).  Although Bailey sets forth a number of errors allegedly committed by the ALJ, fundamentally she argues that the ALJ erred in his evaluation of the medical evidence and erred in his credibility determination.  We shall address each of these arguments in turn.

    A.    *Evaluation of the medical evidence*

        1.    *Non-severity finding*

Bailey first argues that the ALJ erred in failing to find that her thoracic spine condition was a severe impairment.  Step two of the sequential evaluation process focuses on whether the

claimant is suffering from a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment is severe if it is "of magnitude sufficient to limit significantly the individual's ability to do basic work activities." *Santise v. Schweiker*, 676 F.2d 925, 927 (3rd Cir. 1982); *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a).

Here, an MRI of Bailey's thoracic spine conducted on February 15, 2004 revealed a mild right-sided herniation at T7-8 causing mild impress on the spinal cord and a small central protrusion at T8-9 (AR 267).  The mere existence of a diagnosis however, does not demonstrate a disability.  *Plummer v. Apfel*, 186 F.3d 422, 434 (3rd Cir. 1999).  The claimant must demonstrate the she suffers from functional limitations as a result of that impairment.  *Adorno v. Shalala*, 40 F.3d 43, 46 (3rd Cir. 1994).  Although the medical records reflect a thoracic spine condition, there is no evidence in the record that this condition limited Bailey's ability to do basic work activities.  Dr. Bryson's disability assessment in January 2003 was based upon Bailey's fibromyalgia and cervical stenosis (AR 114).  Likewise, Dr. Bryson's opinion in May 2005 that Bailey could not remain gainfully employed was due to her fibromyalgia condition, and not the result of any thoracic condition (AR 303).  Based upon the medical record, we are of the opinion that the ALJ's determination that Bailey's thoracic condition was not severe is supported by substantial evidence.

### 2.      *Treating physician rule*

Bailey argues that the ALJ further erred in his evaluation of the medical evidence with respect to the opinion of her treating physician.  Her argument in substance is that the ALJ erred in failing to give controlling weight to the opinion of Dr. Bryson, and/or rejected her opinion on inadequate grounds in violation of the treating physician rule.  In connection with this argument, we review the fundamental principles which govern the ALJ's consideration of the medical evidence.

We first note that in evaluating a claim for benefits, the ALJ must consider all of the evidence in the case.  *See Plummer*, 186 F.3d at 429.  He is explicitly required to weigh all

relevant, probative, and available evidence. *Adorno*, 40 F.3d at 48. The ALJ may not summarily reject medical evidence; he must articulate in writing his reasons for discounting it. *See Plummer*, 186 F.3d at 429; *Wier on Behalf of Wier v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). Moreover, a treating physician's opinion is given controlling weight only when it is well-supported and consistent with the other evidence of record, *see* 20 C.F.R. § 404.1527(d)(2), and may only be rejected on the basis of contradictory medical testimony. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988). When medical testimony conflicts or is inconsistent, the ALJ is required to choose between them. *Cotter*, 642 F.2d at 705. In making that choice, a treating physician's conclusions are to be examined carefully and accorded more weight than a non-treating physician's opinion. *Podedworny v. Harris*, 745 F.2d 210, 217 (3rd Cir 1984). Where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reasons for doing so. *Sykes v. Apfel*, 228 F.3d 259, 266 (3rd Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence.").

Here, Dr. Bryson, Bailey's treating physician, and a specialist in the field of rheumatology, opined in January 2003 that she was permanently disabled due to fibromyalgia and cervical stenosis (AR 114). Dr. Bryson further opined in May 2005 that Bailey needed to lie down several times throughout the day due to fatigue, and had so much pain with motion of her joints that gainful employment was impossible (AR 303). In his decision, the ALJ declined to accord Dr. Bryson's opinions controlling weight, stating that whether a claimant is "disabled" is an administrative finding reserved to the Commissioner (AR 26). The ALJ "discounted" Dr. Bryson's May 2005 opinion since it was not consistent with the other "substantial medical evidence" of record (AR 26). Specifically, the ALJ concluded:

> While Dr. Bryson reports a lot of tender points upon examination
> of the claimant, there is no indication that fibromyalgia protocol of
> comparing tender points to control points was performed (Exhibits
> 1F, 7F and 10F). In addition, Dr. Bryson gave an explanation of

fibromyalgia in her report of May 13, 2005, but little information
clinically specific to the claimant (Exhibit 16F). Dr. Bryson also
mentioned gastrointestinal complaints characteristic of patients
with fibromyalgia, but none were raised by the claimant at the
hearing (Testimony and Exhibit 16F). In addition, Dr. Ferretti's
assessment at Exhibit 4F is greatly at odds with Dr. Bryson.
Specifically, Dr. Ferretti reported that the claimant's motor
strength was 5/5 bilaterally and the claimant's grip strength was
100 percent bilaterally. Range of motion was essentially normal in
the cervical and lumbar spines. The claimant performed heel/toe
walk without difficulty. Dr. Ferretti assessed the claimant as
capable of occasionally lifting and carrying up to 15 pounds,
standing and walking a total of eight hours at 20 minutes (sic)
intervals and sitting a total of eight hours at 30 minute intervals
(Exhibit 14F). In addition, the claimant was seen by Dr.
Hochrieter for complaints of left knee pain. The undersigned finds
it significant that there is not a single mention of fibromyalgia, just
"a history of chronic back problems" (Exhibit 11F). MRI studies
have shown only mild degenerative changes in the cervical and
thoracic spine (Exhibit 10F). The undersigned also notes that an x-
ray of the claimant's lumbosacral spine was normal (Exhibit 2F)
(AR 26-27).

Although the ALJ did not explicitly specify the weight he attributed to Dr. Bryson's

opinions, it appears he rejected them altogether. In any event, we conclude that the ALJ's

decision to discount or reject Dr. Bryson's opinions are not supported by substantial evidence.

We are first troubled by the vagueness of the ALJ's first cited reason for discounting Dr.

Bryson's opinion, i.e., that she failed to follow "fibromyalgia protocol" of comparing tender

points to control points, since the ALJ failed to cite to a source for explanation. Fibromyalgia is

"a rheumatic disease that causes inflammation of the fibrous connective tissue components of

muscles, tendons, ligaments and other tissue." *Bennecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir.

2004). Clinical signs and symptoms supporting a diagnosis of fibromyalgia under the American

College of Rheumatology Guidelines include "primarily widespread pain in all four quadrants of

the body and at least 11 of 18 specified tender points on the body." *Green-Younger v. Barnhart*,

335 F.3d 99, 107 (2nd Cir. 2003); *see also Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996);

*Kurilla v. Barnhart*, 2005 WL 2704887 at *6 (E.D.Pa. 2005).

Here, a review of Dr. Bryson's treatment notes reveal that she consistently reported that

Bailey had tender points on examination (AR 112, 115, 117, 187). Moreover, Dr. Bryson's

findings of tender points are corroborated by Dr. Ferretti's findings, the Commissioner's own consultative examiner, who reported that Bailey had multiple trigger points around the scapular area, supraspinatus, infraspinatus and rhomboids areas (AR 289).

The ALJ further rejected Dr. Bryson's opinion that Bailey was unable to work on the basis that Dr. Bryson had "provided little information clinically specific to the claimant" (AR 26). To the contrary, in addition to stating that Bailey was unable to work, Dr. Bryson specifically offered an opinion on the "nature and severity" of Bailey's impairment. She opined that Bailey was so fatigued she had to lie down several times throughout the day and suffered pain with motion of her joints (AR 303).

More fundamentally, however, there is medical evidence of record either overlooked or ignored by the ALJ that is potentially material to a proper examination of Dr. Bryson's opinions. For example, treatment notes from Dr. Cornell, Bailey's family physician, consistently reflect that Bailey complained of pain and fatigue. In May 2002, she complained of persistent left shoulder, back and hip pain, and reported difficulty with activities of daily living (AR 155-156). In June 2002, she reported difficulty completing household chores due to fatigue, and that she became "quite stiff" after sitting for about 30 minutes (AR 154). In August 2002 she claimed that she needed to lie down one or two hours per day in order to alleviate her back pain (AR 151). Bailey reported significant pain on a regular basis in September 2002, and in February 2003 described difficulty with pain and activities of daily living (AR 147; 150). Finally, in April 2004, Dr. Cornell noted that Bailey was "quite limited" in her physical activities (AR 270).

We recognize that Dr. Bryson's opinion that Bailey is unable to work is not binding on the Commissioner. 20 C.F.R. § 404.1527(e)(1). Nonetheless, it is the duty of the ALJ to "review all of the medical findings and other evidence that support a medical source's statement that [a claimant] is disabled." Id. (emphasis added). We are of the opinion that the ALJ's selective review of the medical findings was inconsistent with the above standard. Given the potential materiality of the above discussed evidence, we are of the view that a remand is appropriate so

that the ALJ can address them consistent with the requirements of *Cotter*.[1]

    B.    *Credibility determination*

Bailey further challenges the ALJ's credibility determination.  An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record.  20 C.F.R. § 404.1529(a).  Subjective complaints must be seriously considered, whether or not they are fully confirmed by the objective medical evidence.  *See Smith v. Califano*, 637 F.2d 968 (3rd Cir. 1981).  The ALJ as the finder of fact can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record.  *Baerga v. Richardson,* 500 F.2d 309, 312 (3rd Cir. 1974).  The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court.  *See Van Horn v. Schweiker*, 717 F2d 871, 873 (3rd Cir. 1983).

Here, the ALJ found that while Bailey had "some pain", he determined that it was not so severe or limiting as to be disabling (AR 26).  In making this determination, the ALJ purportedly examined the medical evidence of record, and cited to several treatment notes in support of his determination (AR 26).  However, as we discussed in connection with his review of Dr. Bryson's opinions, he failed to explain his basis for rejecting other medical evidence arguably supportive

---

[1] We also comment briefly on the ALJ's reliance on Dr. Ferretti in discounting Dr. Bryson's opinion.  Dr. Bryson is a specialist in rheumatology and a long-term treating source, in contrast with Dr. Ferretti, who was not a specialist or a long-term treating source.  20 C.F.R. § 404.1527(d)(2) and (5) (noting that generally more weight is given to opinions from treating sources, as well as specialists about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist).  Moreover, we observe that the ALJ cited to Dr. Ferretti's negative physical examination findings in discounting Dr. Bryson's opinions.  The ALJ's reliance on the lack of objective findings was misplaced.  As observed in *Green-Younger v. Barnhart*, 335 F.3d 99, 108-09 (2nd Cir. 2003), "[i]n stark contrast to the unremitting pain of which [fibromyalgia] patients complain, physical examinations will usually yield normal results - a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions."  *Id*. at 108-09 (quoting *Preston v. Secretary of Health and Human Services,* 854 F.2d 815, 817-18 (6th Cir. 1988); *see also Hirschfeld v. Apfel*, 159 F. Supp. 2d 802, 812 (E.D.Pa. 2001) (noting that symptoms of fibromyalgia are entirely subjective).

of her claim of disability. *Cotter,* 642 F.2d at 705 (ALJ must mention relevant evidence which clearly supports the claim and give his or her reasons for rejecting such evidence).

The ALJ also relied on the fact that Bailey was able to care for her personal needs, begin to prepare a meal, vacuum, grocery shop for a few items, needlepoint and walk (AR 26). The fact that Bailey may sporadically engage in certain household chores does not, in and of itself, support the ALJ's conclusion that she is capable of substantial gainful activity. *See Smith v. Califano*, 637 F.2d 968, 971-72 (3rd Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity. ... It is well established that sporadic or transitory activity does not disprove disability.").

### IV. CONCLUSION

Based upon the foregoing reasons, Bailey's motion for summary judgment shall be denied, and the Commissioner's motion for summary judgment shall be denied. The matter shall be remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion. The ALJ is free to seek additional evidence and/or call a vocational expert if he feels it is necessary. An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RHONDA BAILEY,                                  ) | |
|                                                 ) | |
|     Plaintiff,             ) | |
|                                                 ) | |
|     v.                      ) | Civil Action No. 06-18 Erie |
|                                                 ) | |
| JO ANNE B. BARNHART,                            ) | |
| Commissioner of Social Security,                ) | |
|                                                 ) | |
|     Defendant.              ) | |

## **ORDER**

AND NOW, this 3rd day of November, 2006, and for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Doc. No. 11] is DENIED and Defendant's Motion for Summary Judgment [Doc. No. 13] is DENIED.  The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is hereby directed to mark the case closed.

                                  s/ Sean J. McLaughlin
                                  United States District Judge

cm: All parties of record.

21